IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FICEP CORPORATION, *

Plaintiff, *

v. * CIVIL NO.: WDQ-13-0429

VOORTMAN USA CORP., *

Defendant. *

* * * * * * * * * * * * *

MEMORANDUM OPINION

Ficep Corporation ("Ficep") sued Voortman USA Corp. ("Voortman") under 35 U.S.C. § 271 for infringement of patent 7,974,719 (the "'719 patent"). ECF No. 1. Voortman counterclaimed for declarations of invalidity and non-infringement of the '719 patent. ECF No. 19. The Court held a *Markman*[1] claim construction hearing. ECF No. 52. Pending is Ficep's motion for partial reconsideration or modification of the Court's July 16, 2014 claim construction Order. ECF No. 58. No hearing is necessary. Local Rule 105.6 (D. Md. 2014). For the following reasons, Ficep's motion for partial reconsideration will be granted.

---

1 *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

I. Background

A. The Parties and the Patent

Ficep is a "supplier of structural steel and plate fabrication and processing systems." ECF No. 1 ¶ 5. It owns all rights, title, and interest in the '719 patent, which "relates to systems and methods for the manufacture of construction components, such as steel beams." *Id.* Voortman's layout marking system products, coping products, drilling products, and plate processing products allegedly infringe the '719 patent. *Id.* ¶ 9.

The '719 patent is titled "Method and an Apparatus for Automatic Manufacture of an Object with Multiple Intersecting Components." ECF No. 34-1 at 4. The patent relates to manufacturing systems in which Computer-Aided Design ("CAD") programs are used to design three-dimensional models of physical objects that are then transmitted to manufacturing machines for manufacture of the objects or object components on an assembly line. *See id.* The patent specification[2] discusses how this manufacturing process "typically" requires a human operator to "program manually the manufacturing machines . . . based on the [CAD] display . . . ." *Id.* col.1:25-30. "Human intervention is

[2] The "specification" is "[t]he part of a patent application describing how an invention is made and used, the best mode of operation of the claimed invention, and the inventor's claims." Black's Law Dictionary (9th ed. 2009).

generally necessary to review . . . and to provide the necessary [CAD] information to the [manufacturing machines]." *Id.* col.1:32-36. "Because the [CAD] design specifications . . . must be passed manually by a human operator" to the manufacturing machine, "a problem arises when the specialized human operator, capable of inputting data into the manufacturing machine, is unavailable," or "err[s] when providing instructions to automated assembly line equipment." *Id.* col.1:37-55. The patent purports to resolve this problem and also to incorporate "design parameters related to intersections and points of contact or connection between components." *Id.*

The method taught by the patent aims to increase efficiency and reduce costs in systems "related to automatic manufacture of an object with multiple intersecting components." *Id.* col.1:65-66, col.2:1-2. The method uses a component called a programmable logic controller ("PLC"). *Id.* col.2:11-12. The PLC receives "a design model of the object," from which it extracts and identifies "a plurality of intersection and/or manufacturing parameters that define a plurality of intersections of the components." *See id.* col.2:11-18.[3] The parameters and dimensions are then transmitted from the PLC to

[3] The receiving step is generally performed electronically; however, a technician may manually transfer the design model to the PLC from a computer disk. ECF No. 34-1 at 5-6, col.3:47-52, col.6:34-40.

the manufacturing machines. *Id.* col.2:18-22.[4] Finally, the manufacturing machines manufacture the components "based at least in part on the transmitted dimensions [and] parameters."[5] *Id.* col.2:22-25.

The patent has 14 claims, three of which are independent claims. *Id.* at 7-8, col.7-10. The first independent claim (claim 1) describes the steps of "[a] method for automatic manufacture of an object," as discussed above. *Id.* at 7, col.7:49-66, col.8:1-8. The second independent claim (claim 7) and third independent claim (claim 14) describe an apparatus and article of manufacture, respectively, for "automatic manufacture of an object." *Id.* at 7-8, col.8:25-55, col.9:6-17, col.10:1-16.

Ficep[6] initially applied to the Patent and Trademark Office ("PTO") for the '719 patent on November 26, 2008. ECF No. 33-2 at 2-3. On September 17, 2010, by Office Action, the PTO

---

[4] "This transmission can occur automatically, i.e., without human intervention." *Id.* at 5, col.3:53-54. However, similar to the receiving step, the parameters and dimensions may be transmitted by transferring computer readable code on a computer disk. *Id.* at 5, col.6:51-57.

[5] The patent specification also describes an apparatus and article of manufacture that perform the functions of this automatic manufacturing method. *Id.* at 4-5, col.2:26-67, col.3:1-3.

[6] Although the patent application was not filed in Ficep's name, the Court will adopt the parties' practice and refer to the applicant as Ficep. *See* ECF No. 39 at 8-9.

rejected all of the '719 patent claims, in pertinent part, because they were anticipated by patent 4,998,206 authored by Jones *et al.* ("Jones").[7] ECF No. 33-2 at 146, 150. On February 17, 2011, in response to this Office Action, Ficep proposed amendments to the title and claims of the '719 patent. *Id.* at 164-71. Ficep also made several arguments about why the '719 patent was not anticipated by Jones. For example, Ficep argued that Jones was directed to manufacturing individual or separate components, while the '719 patent provided for "a design model of an entire object having multiple components in contact with one another at one or more intersection points." *Id.* at 173-74.

Ficep also argued that "Jones [is] concerned with the kind of system described in the background section of applicant's disclosure[, in which] a human operator typically must program manually manufacturing machines associated with an assembly line." *Id.* at 177. The '719 patent eliminates the problems of operator unavailability or the occurrence of "errors made in the process of transferring a CAD generated design into instructions for controlling a manufacturing machine." *Id.* The '719 patent claims "include[] at least one [PLC which,] being in

[7] The '719 patent was rejected under 35 U.S.C. § 102, which currently provides, *inter alia*, that "[a] person shall be entitled to a patent unless . . . the claimed invention was described in a patent issued under section 151 . . . in which the patent or application . . . names another inventor and was effectively filed before the effective filing date of the claimed invention." 35 U.S.C. § 102(a); ECF No. 33-2 at 150.

communication with both the computing device . . . and the manufacturing machine . . . overcomes the problems of the prior art. . . . By means of a receiver, . . . the extraction of a design model at the PLC can be performed with respect to any CAD system used at the computer." *Id.* at 177-78. On the basis of these and other arguments, the PTO allowed the claims. *See id.* at 194-95.

B. Procedural History

On February 7, 2013, Ficep sued Voortman for directly, indirectly, and willfully infringing the '719 patent, in violation of 35 U.S.C. § 271. ECF No. 1. On April 17, 2013, Voortman answered and asserted counterclaims for a declaratory judgment of the invalidity and non-infringement of the '719 patent. ECF No. 19 at 5-8. On May 13, 2013, Ficep answered Voortman's counterclaims. ECF No. 27.

On January 13, 2014, the parties submitted a Joint Claim Construction Statement. ECF No. 32. That day, Ficep and Voortman submitted their opening claim construction briefs. ECF Nos. 33, 34. On February 27, 2014, Ficep and Voortman filed their responsive claim construction briefs. ECF Nos. 39, 40. On June 26, 2014, the Court held a *Markman* hearing. ECF No. 52.

On July 16, 2014, the Court issued its claim construction Order. ECF Nos. 56, 57. Relying on prosecution history,[8] the Court found that Ficep had disclaimed human intervention at the receiving and transmitting steps at the PLC. ECF No. 56 at 25. Accordingly, the Court added the phrase "without human intervention" to the following relevant claim limitations in claims 1, 7, and 14:

> "receiving, *without human intervention* at a programmable logic controller, the design model of the object"
>
> "transmitting, *without human intervention*, the intersection and manufacturing parameters and the component dimensions from the programmable logic controller to at least one manufacturing machine"
>
> "a receiver associated with the programmable logic controller for receiving, *without human intervention*, the design model of the object"
>
> "a transmitter associated with the processor for transmitting, *without human intervention*, the intersection and machining parameters and the component dimensions from the programmable logic controller to the at least one manufacturing machine"
>
> "computer-readable code for transmitting, *without human intervention*, the intersection and manufacturing parameters and the component dimensions from the programmable logic controller to at least one manufacturing machine"

---

[8] Also termed the "file wrapper," the prosecution history is "[t]he complete record of proceedings in the [PTO] from the initial application to the issued patent[;] specif., a patent . . . application together with all documentation, correspondence, and any other record of proceedings before the PTO concerning that application." Black's Law Dictionary (9th ed. 2009).

ECF No. 56 at 30-31, 41-42 (emphasis added).[9]

On July 30, 2014, Ficep moved for partial reconsideration or modification of the Court's claim construction Order. ECF No. 58.[10] On August 18, 2014, Voortman opposed Ficep's motion. ECF No. 59. On September 5, 2014, Ficep replied. ECF No. 60.

## II. Analysis

### A. Legal Standard

Motions for reconsideration of an interlocutory order[11] are governed by Federal Rule of Civil Procedure 54(b), under which "any order . . . may be revised at any time before the entry of

---

[9] The Court rejected Voortman's contention that the phrase "without human intervention" should be added to several additional claim terms. ECF No. 56 at 26-27. After reviewing the prosecution history, the Court reasoned that although Ficep had distinguished Jones "on the basis that human operation was no longer needed in transferring instructions from the CAD terminal to the manufacturing machine," it had *not* distinguished Jones "on the basis of the 'automated' nature of the system as a whole." *Id.* at 26. Accordingly, the prosecution history did not "support the addition of the phrase 'without human intervention' to claim terms that [were] not expressly associated with actions performed at the PLC." *Id.* at 27.

[10] Ficep urges the Court to find that the phrase "without human intervention" should not have been included in the above claim limitations, or, alternatively, to modify the inclusion to "without requiring specialized human intervention." ECF No. 58 at 10-19.

[11] "Determinations of claim construction following a *Markman* hearing are interlocutory in nature, . . . and do not trigger the heightened standards for reconsideration of final orders." *Remediation Products, Inc. v. Adventus Americas Inc.*, No. 3:07CV153-RJC, 2009 WL 57456, at *1 (W.D.N.C. Jan. 7, 2009) (*citing Nystrom v. TREX Co.*, 339 F.3d 1347, 1350 (Fed. Cir. 2003)).

a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).[12] Thus, when warranted, a district court retains the power to reconsider and modify its interlocutory judgments at any time before final judgment. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003).[13] Resolution of the motion is "committed to the discretion of the district court," *id.* at 515, and "the goal is to reach the correct judgment under law." *Netscape Commc'n Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 547 (E.D. Va. 2010) (internal citations omitted).

Although Rule 60(b) applies only to final judgments, a court may consider the reasons in that rule when deciding whether to grant relief under Rule 54(b).[14] *See Fayetteville Investors*, 936 F.2d at 1470; *Mateti*, 2009 WL 3633339, at *4. Relief under Rule 60(b) is not authorized when the movant merely asks the Court to "change its mind." *Pritchard v. Wal-Mart*

---

[12] *See Mateti v. Activus Fin., LLC*, No. DKC-08-0540, 2009 WL 3633339, at *4 (D. Md. Oct. 27, 2009).

[13] *See also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment.").

[14] Under Rule 60(b), a court may grant relief from a judgment or order for: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or misconduct by the opposing party; (4) voidness; (5) satisfaction; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b).

*Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001). However, as a general rule, "review of an interlocutory order under Rule 54 is not subject to the restrictive standards of motions for reconsideration of final judgments under Rule 60." *Fayetteville Investors*, 936 F.2d at 1472. Because the Court finds Ficep's merits-based arguments persuasive, the Court will exercise its discretion under Rule 54(b) to reconsider its claim construction Order.[15]

B. Ficep's Motion

Ficep argues that the prosecution history did not clearly and unmistakably surrender "all human intervention at the PLC." ECF No. 58-1 at 10. Voortman argues that Ficep has mischaracterized the patent specification and prosecution history, and the Court correctly added "without human intervention" to the "receiving" and "transmitting" limitations. ECF No. 59 at 11.

---

[15] *See Netscape Commc'n Corp.*, 704 F. Supp. 2d at 546 (Rule 54(b) motions do "not require a showing of extraordinary circumstances"); *Remediation Products*, 2009 WL 57456, at *1 ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.")(alteration omitted)(*quoting Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting)). *Cf. Imagexpo, L.L.C. v. Microsoft Corp.*, 271 F. Supp. 2d 834, 836-37 (E.D. Va. 2003)(declining to reconsider claim construction when movant's arguments were unpersuasive and contrary to distinctions made during prosecution history). Accordingly, the Court need not address the parties' arguments about whether the Court should reconsider its ruling, and will proceed to the merits of Ficep's motion.

Consideration of the prosecution history is appropriate when, as here, it has been admitted into evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (internal quotation marks omitted). "When the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim term to exclude the disclaimed matter." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005).[16] However, the prosecution history is often less useful than the specification for claim construction, because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation,

---

[16] This Court's previous claim construction Order cites two Federal Circuit cases for the standard on when prosecution history limits the interpretation of claim terms. *See* ECF No. 57 at 8 (*quoting Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 987 (1995)("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004)("[T]he ordinary and customary meaning of a term does not govern if the intrinsic record contains clear lexicography or disavowal of claim scope . . . ."")). Although both cases remain good law, more recent opinions by the Federal Circuit rely on the "clear and unmistakable" standard stated in *SanDisk Corp*. *See, e.g.*, *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1098 (Fed. Cir. 2013); *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012). Although Ficep argues that the Court applied the wrong legal standard, ECF No. 58-1 at 9, the Court is unable to discern any substantive difference between "clear . . . disavowal" under *C.R. Bard, Inc.* and "clear and unmistakable . . . disclaim[er]" under *SanDisk Corp.*, or any change in the way the Federal Circuit treats prosecution history.

[and] often lacks the clarity of the specification." *Phillips*, 415 F.3d at 1317. In most cases, an analysis of the intrinsic evidence--the patent specification and prosecution history--"resolves any ambiguities in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

Ficep contends that the Court misread the portion of prosecution history wherein Ficep distinguished Jones and purported to solve the problems of operator unavailability and error. ECF No. 58-1 at 13-14. The Court had emphasized three of Ficep's statements: (1) that "Jones [is] concerned with the kind of system described in the background section[17] of applicant's disclosure[, in which] a human operator typically must *program manually* manufacturing machines associated with an assembly line"; (2) the '719 patent "invention aims to eliminate such problems [by] eliminat[ing] errors made in the process of transferring a CAD generated design into instructions for controlling a manufacturing machine"; and (3) the '719 patent claims "include[] at least one [PLC which,] being in communication with both the computing device . . . and the manufacturing machine . . . overcomes the problems of the prior

[17] The background section of Ficep's patent application discusses how manufacturing "typically" requires a human operator to manually program the manufacturing machines, and, thus, problems arise when the *specialized* human operator errs or is unavailable.

art." ECF No. 56 at 24-25 (*quoting* ECF No. 33-2 at 177) (emphasis and footnote added) (alterations in original). From those statements, the Court found that Ficep had "clearly distinguish[ed] Jones on the basis that human operation [was] no longer needed in transferring instructions from the CAD terminal to the manufac-turing machine" and, thus, had disclaimed "human intervention at the PLC step." *Id.* at 25-26.

As to the first statement, Ficep argues that "manual pro-gramming" means "*translat[ing]* the CAD drawing into the ins-tructions that program the machine"--in other words, the "identifying" and "extracting" steps, not the "receiving" and "transmitting" steps the Court found had needed no human intervention. ECF No. 58-1 at 10, 14(emphasis added). Ficep further argues that although the prosecution history referenced the unavailable human operator, it had referred to--and, thus, meant--the unavailable *specialized* human operator described in the background section, "who could perform manual programming based on a CAD drawing, not any human at all." *Id.* at 15.

Voortman argues that the human operator--specialized or not--described in the background is someone who manually "pass[es]," "input[s]" or "provid[es]" the CAD specifications to the manufacturing machines. ECF No. 59 at 12-13 (*quoting* ECF No. 34-1 at 2, col.1:37-55). Thus, Voortman argues, "program" does not mean "translate," but rather, transmit. *Id.* at 13-14.

A careful review of the background section shows that the passing/inputting/providing description of the human operator's functions had been included in a summary and explanation of the problems that occurred when, as discussed in the preceding paragraph, human intervention was needed to "review" and "provide the *necessary* [CAD] information" to the manufacturing machines. ECF No. 34-1 at 4, col.1:25-55. By requiring review and discernment of what constitutes "necessary" CAD information, manual programming requires some degree of translation "by a specialized human operator [who is] capable of" doing so. *Id.* col.1:41-43. Thus, the manual programming identified in the background section refers to the process by which the PLC extracts and identifies the necessary information from the CAD design model, which is then transmitted to the manufacturing machines, *see id.* at 7, col.7-8. Accordingly, Ficep had distinguished prior art on the basis that the '719 patent teaches a method that does not require human intervention at the extracting and identifying steps, not the receiving and transmitting steps, thereby avoiding problems associated with specialized human operator unavailability or error.[18]

[18] The Court's claim construction Order had characterized Ficep's argument during claim prosecution as that, "unlike Jones, the '719 patent teaches a method which does not require human intervention to transfer instructions from the CAD terminal to the manufacturing machine." ECF No. 56 at 25. However, Ficep had actually stated that "[t]he '719 patent 'invention aims to

This conclusion is supported by the sentence that immediately follows the third statement, but which the Court omitted from its claim construction Order. Although Ficep had stated that its invention overcomes the problems of the prior art by including a PLC that communicates with the computing device and the manufacturing machine, it then clarified that "[b]y means of a receiver, . . . the *extraction* of a design model at the PLC can be performed with respect to any CAD system used at the computer." ECF No. 33-2 at 177-78 (emphasis added). In finding disclaimer, the Court had focused on the PLC's communication with the computing device and manufacturing machines to conclude that "the '719 patent teaches a method which does not require human intervention to *transfer* instructions from the CAD terminal to the manufacturing machine." ECF No. 56 at 25. However, the Court did not take into account the clarifying language in the next sentence, whereby Ficep focused its distinction on the extraction step.

At the very least, Ficep has not clearly and unmistakably disclaimed human intervention at the receiving and transmitting

---

eliminate . . . errors made in the *process of transferring* a CAD generated design into instructions for controlling a manufacturing machine.'" ECF No. 33-2 at 177. Thus, it was not mere transfer that posed problems when human intervention was needed, but the overall *process* by which CAD information was turned into instructions for the manufacturing machines--a process that includes extracting and identifying CAD information.

steps--steps that the specification states may be performed manually. *See* ECF No. 34-1 at 5-6, col.3:47-54, col.6:34-40, 51-57; *SanDisk Corp.*, 415 F.3d at 1286-87 ("An ambiguous disclaimer . . . does not advance the patent's notice function or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning."); *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003) (no disclaimer when "the statements in the prosecution history are subject to multiple reasonable interpretations").

Accordingly, the Court incorrectly found that the intrinsic evidence supported disclaimer as to the receiving and transmitting steps. The phrase "without human intervention" will be removed from claim limitations in claims 1, 7, and 14 that reference those steps. For the parties' convenience, the Court has attached a chart summarizing its construction of the disputed '719 patent claims with the amended constructions discussed above.

| Claim Language | Court's Construction |
|---|---|
| Preamble | |
| 1. "automatic manufacture of an object" | No change; plain and ordinary meaning |
| Claim 1 | |
| 2. "design model of an object" | "design model of an object, in the form of an electronic file" |
| 3. "receiving, at a programmable logic controller, the design model of the object" | No change; plain and ordinary meaning |
| 4. "extracting from the design model a plurality of component dimensions defining a plurality of components of the object" | No change; plain and ordinary meaning |
| 5. "identifying a plurality of intersection and manufacturing parameters which define in part the intersection of the two components" | "identifying a plurality of intersection and manufacturing parameters which define in part the intersection of the two components and the manufacturing to be performed" |
| 6. "extracting from the design model the intersection and manufacturing parameters" | No change; plain and ordinary meaning |
| 7. "transmitting the intersection and manufacturing parameters and the component dimensions from the programmable logic controller to at least one manufacturing machine" | No change; plain and ordinary meaning |
| 8. "manufacturing, by means of the at least one manufacturing machine, the components based at least partly on the transmitted component dimensions and the transmitted intersection and manufacturing parameters" | No change; plain and ordinary meaning |
| Claims 7 and 14 | |
| 9. "a receiver associated with the programmable logic controller for receiving the design model of the object" | No change; plain and ordinary meaning |
| 10. "a processor which is associated with the programmable logic controller and extracts from the design | "a processor which is associated with the programmable logic controller and extracts, without human |

| | |
|---|---|
| model a plurality of dimensions of components which define a plurality of components of the object" | intervention, from the design model a plurality of dimensions of components which define a plurality of components of the object" |
| 11. "wherein the processor identifies a plurality of intersection parameters which define the intersection of the two components" | "wherein the processor associated with the programmable logic controller identifies, without human intervention, a plurality of intersection parameters which define the intersection of the two components" |
| 12. "wherein the processor extracts from the design model the intersection parameters" | "wherein the processor associated with the programmable logic controller extracts, without human intervention, from the design model the intersection parameters" |
| 13. "a transmitter associated with the processor for transmitting the intersection and machining parameters and the component dimensions from the programmable logic controller to the at least one manufacturing machine" | No change; plain and ordinary meaning |
| 14. "wherein the at least one manufacturing machine manufactures the components based at least in part on the transmitted component dimensions and on the transmitted intersection and manufacturing parameters" | No change; plain and ordinary meaning |
| 15. "computer-readable code for extracting from the design model a plurality of component dimensions which define a plurality of components of the object" | No change; plain and ordinary meaning |
| 16. "computer-readable code for identifying a plurality of intersection parameters which define the intersection of the two components" | No change; plain and ordinary meaning |

| | |
|---|---|
| 17. "computer-readable code for extracting from the design model the intersection and manufacturing parameters" | No change; plain and ordinary meaning |
| 18. "computer-readable code for transmitting the intersection and manufacturing parameters and the component dimensions from the programmable logic controller to at least one manufacturing machine" | No change; plain and ordinary meaning |
| 19. "computer-readable code for manufacturing, by means of the at least one manufacturing machine, the components based at least in part on the transmitted component dimensions and on the transmitted parameters." | No change; plain and ordinary meaning |

III. Conclusion

For the reasons stated above, the Court will grant Ficep's motion for partial reconsideration, and adopt the amended constructions as described.

3/24/15
Date

William D. Quarles, Jr.
United States District Judge